**ANTONIA M. APPS**
**Regional Director**
**Sheldon L. Pollock**
**Lee A. Greenwood**
**Steven G. Rawlings**
**Daniel Loss**
**Sushila Rao Pentapati**
**Suzanne M. Bettis**
**Joshua D. Tannen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**212-336-0410 (Rao Pentapati)**
PentapatiSu@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | |
| -against- | 24 Civ. 4348 |
| **MARIO GOGLIORMELLA,** **STEVEN LACAJ, and** **KARIM IBRAHIM (a/k/a "CHRIS HAYES"),** | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| **ADAM IBRAHIM,** | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Mario Gogliormella ("Gogliormella"), Steven Lacaj ("Lacaj"), and Karim Ibrahim

(collectively, "Defendants") and Relief Defendant Adam Ibrahim, alleges as follows:

**SUMMARY**

1.      For over three years, Defendants operated boiler rooms using a network of unregistered sales agents to conduct illegal, unregistered, and fraudulent offerings of securities, in the form of interests in investment vehicles that purportedly gave investors access to shares ("Pre-IPO Shares") of private companies that were on the verge of "going public" ("Pre-IPO Companies"). Boiler rooms are call centers that typically use high-pressure sales tactics and intensive, high-volume sales campaigns to induce investors to buy securities, such as those at issue here.

2.      From approximately June 2019 to February 2022 (the "StraightPath Period"), Defendants and their unregistered sales force sold Pre-IPO Shares on behalf of StraightPath Venture Partners LLC ("StraightPath") and raised at least $149 million from over 1,000 investors located around the country, including in this District, and internationally.  The Commission previously brought an emergency action alleging fraud, unregistered broker-dealer activity, and unregistered securities offerings against StraightPath and its principals.  *See SEC v. StraightPath Venture Partners LLC, et al.*, No. 22-cv-3897 (LAK) (S.D.N.Y. May 13, 2022) (the "StraightPath Action").

3.      Then, just as StraightPath was under the scrutiny of the Commission investigation that resulted in an enforcement action to shut down its operations, Defendants launched a new entity, Legend Venture Partners LLC ("Legend"), to rebrand their fraud.  From February through October 2022 (the "Legend Period," and, collectively with the StraightPath Period, the "Relevant Period"), Defendants operated Legend and, together with their unregistered sales force, raised over $35 million from more than 300 investors around the country, including in this District, and internationally, a majority of whom had earlier invested with StraightPath.  The Commission previously brought an emergency action alleging fraud, unregistered broker-dealer activity, and

unregistered securities offerings against Legend.  *See SEC v. Legend Venture Partners LLC*, No. 23-cv-5326 (LAK) (S.D.N.Y. June 22, 2023) (the "Legend Action").

4.      Throughout the Relevant Period, Defendants procured more than $184 million in investor funds by fraud, including falsely leading investors to believe that StraightPath and Legend would only make money when investors did (upon a profitable public listing by one of the Pre-IPO Companies), and that investors would not pay any upfront fees or commissions.  In fact, though, investors paid exorbitant upfront markups on their investments, allowing Defendants and their sales force to pocket millions of dollars before investors made a dime.

5.      In exchange for their investments, StraightPath and Legend investors received interests in a subdivision (called a "Series") of one of nine StraightPath investment funds (the "StraightPath Funds") or one of five Legend investment funds (the "Legend Funds"), which were structured as limited liability companies ("LLCs").  Defendants and their sales force told investors that each Series invested in Pre-IPO Shares of a particular Pre-IPO Company.  Defendants and their sales force pitched these Series interests as a way for retail investors to effectively own limited-supply Pre-IPO Shares that could not yet be bought on a public stock exchange, and at prices purportedly lower than the current valuations and anticipated public listing prices of those shares.

6.      At Defendants' direction, their sales force typically cold-called hundreds of investors daily.  Using sales scripts provided by Defendants, the unregistered sales agents told investors that StraightPath or Legend would charge only a 20% fee on back-end profits (if any) earned after the applicable Pre-IPO Company went public.  This led investors to believe that their interests were fully aligned with Defendants' interests.  In fact, however, Defendants profited handsomely upfront, immediately pocketing tens of millions of dollars on their sales to investors through undisclosed

markups that averaged between 19% and 105% above the prices StraightPath or Legend had paid, or would pay, for Pre-IPO Shares of the relevant Pre-IPO Companies.[1]

7.      During the Relevant Period, Defendants and their sales force pocketed for themselves more than $45 million in fees.  Specifically, during the StraightPath Period, Defendants raised at least $149 million from investors and, through their entity L&G Capital Corp. ("L&G"), received from StraightPath nearly $35 million in upfront commission payments, the vast majority of which they paid to their unregistered sales force (more than $14.4 million) or kept for themselves (more than $18.8 million).  Then, during the Legend Period, Defendants and their unregistered sales force raised another approximately $35.5 million from investors, out of which Defendants pocketed more than $9.3 million and separately paid their unregistered sales force more than $3.25 million, before any of the Pre-IPO Companies marketed by Legend went public (which not one has to date).

8.      Through their sales force, Defendants made additional misrepresentations to investors, such as falsely claiming that the investments they were pitching would double or triple in value through near-term public listings and overstating the research capabilities, industry connections, and track records of StraightPath and Legend.  In Legend's offering documents, Defendants also concealed the involvement of Gogliormella and Karim Ibrahim, both of whom had been the subject of public customer complaints and the latter of whom had been suspended by the Financial Industry Regulatory Authority ("FINRA") for having previously defrauded a customer.

9.      As a result of Defendants' fraud, investors suffered substantial pecuniary harm. Investors expended significant funds acquiring interests in the StraightPath and Legend Funds based on the material misrepresentations alleged herein.  In many instances, the Pre-IPO Companies at issue have not gone public even years later.  As a result, many investors have recouped none of their

_____

[1] Significantly, however, StraightPath did not obtain sufficient Pre-IPO Share interests to backstop all the interests in the StraightPath Funds that it sold to investors.

investments.  All the while, Defendants have used investor proceeds to fund lavish lifestyles and make many luxury purchases, including trips on private jets, Rolex and Audemars Piguet watches, Bentley and Rolls Royce cars, and luxury residences on Long Island and in Miami.

10.     In connection with their fraudulent scheme, Defendants also violated the securities and broker-dealer registration provisions of the federal securities laws.  Specifically, none of the offers or sales of interests in the StraightPath Funds or Legend Funds were registered with the Commission and no exemption applied.  Furthermore, Defendants and their sales force, all of whom received transaction-based compensation, acted as brokers without being registered as broker-dealers or associated with registered broker-dealers.

## VIOLATIONS

11.     By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and, with respect to the Legend Period, Sections 206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; Gogliormella is liable as a control person for the violations by L&G and Legend of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and Defendants have aided and abetted violations by StraightPath, StraightPath Management LLC, and Legend of Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and, with respect to Legend, Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

12.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

13.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. § 77t(b) and 77t(d)]; Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]; and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

14.     The Commission seeks a final judgment: (a) ordering permanent injunctive relief against Defendants; (b) ordering Defendants to disgorge the ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to each pay a civil money penalty pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209 [15 U.S.C. § 80b-9]; (d) ordering Relief Defendant Adam Ibrahim to pay, with prejudgment interest, all ill-gotten gains by which he was unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214(a) [15 U.S.C. § 80b-14(a)].

16.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

17.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. During the StraightPath Period, L&G's primary office was in lower Manhattan, and, during the Legend Period, Legend's primary office was also in lower Manhattan.  Additionally, certain acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including calls and emails to prospective and actual investors and sales of interests in the StraightPath Funds to at least 30 investors, and in the Legend Funds to at least 10 investors, located in Manhattan and elsewhere in this District.

## DEFENDANTS

18.     **Gogliormella**, age 47, resides in Manhasset, NY.  Gogliormella was one of the founders and principals of L&G and Legend.  Between 1998 and 2019, Gogliormella was a registered broker at four different broker-dealers and held Series 7 and Series 63 licenses.  He has not been registered with the Commission as a broker since 2019.  Gogliormella has been the subject of at least five customer complaints from his time in the securities industry, which alleged churning (*i.e.*, excessive trading of client brokerage assets for the purpose of generating commissions), unauthorized trading, and/or unsuitable investment recommendations.  In connection with the Commission staff's investigation, Gogliormella declined to answer questions relating to StraightPath and Legend when subpoenaed to testify and instead invoked his Fifth Amendment privilege against self-incrimination.

19.     **Lacaj**, age 27, resides in New York, NY.  Lacaj was one of the founders and principals of L&G and Legend.  Between 2016 and 2019, Lacaj was a registered broker at three

different broker-dealers and held Series 7 and Series 63 licenses.  He has not been registered with the Commission as a broker since 2019.  In connection with the Commission staff's investigation, Lacaj declined to answer questions relating to StraightPath and Legend when subpoenaed to testify and instead invoked his Fifth Amendment privilege against self-incrimination.

20.     **Karim Ibrahim (a/k/a "Chris Hayes")**, age 34, resides in Queens, NY.  Karim Ibrahim was also one of the founders and principals of L&G.  Although his brother Adam Ibrahim was listed as an owner of Legend on its corporate-formation documents, in reality, Karim Ibrahim was the third Legend founder and functioned as one of its principals.  Between 2011 and 2015, Karim Ibrahim was a registered broker at two different broker-dealers and held Series 7 and Series 63 licenses.  He has not been registered with the Commission as a broker since 2015.  From November 16, 2016, to November 20, 2018, Karim Ibrahim was suspended from association with any member of FINRA resulting from a determination by FINRA that he had committed fraud in the sale of interests in a securities firm for which he had worked.  Karim Ibrahim has been the subject of at least four customer complaints during his time in the securities industry, which alleged fraud, churning, unauthorized trading, and/or unsuitable investment recommendations.  During the Relevant Period, Karim Ibrahim at times communicated with investors in the StraightPath Funds and the Legend Funds using the alias "Chris Hayes."  During the Legend Period, Karim Ibrahim also communicated with Legend investors using his brother Adam Ibrahim's name.  In connection with the Commission staff's investigation, Karim Ibrahim declined to answer questions relating to StraightPath and Legend when subpoenaed to testify and instead invoked his Fifth Amendment privilege against self-incrimination.

**RELIEF DEFENDANT**

21.     **Adam Ibrahim**, age 31, resides in Queens, NY.  He is the brother of Karim Ibrahim.  From 2019 through 2022, Adam Ibrahim received cash, interests in the StraightPath

Funds, and Pre-IPO Shares totaling more than $1.8 million, which constituted or were acquired with proceeds Karim Ibrahim earned from his misconduct as alleged herein.  Along with Gogliormella and Lacaj, Adam Ibrahim's name appeared on Legend's corporate-formation documents, but it was Karim Ibrahim who acted as Legend's third principal.

## OTHER RELEVANT ENTITIES

22.     **StraightPath** is a Delaware LLC incorporated on May 11, 2017, which owned and managed the StraightPath Funds.  From 2017 until mid-2021, its office was in Manhattan; in mid-2021, it moved its office to Jupiter, Florida.  It has never been registered with the Commission in any capacity.  Since June 14, 2022, it has been in receivership as a result of the StraightPath Action.

23.     **StraightPath Management LLC** ("StraightPath Management") is a Delaware LLC incorporated on May 11, 2017, which served as investment adviser to the StraightPath Funds and as managing member of StraightPath.  StraightPath Management's office was also in Manhattan until mid-2021 before moving to Jupiter, Florida.  It is an SEC-registered exempt reporting adviser.  Since June 14, 2022, it has been in receivership as a result of the StraightPath Action.

24.     **L&G** was a New York corporation incorporated on May 31, 2019, and voluntarily dissolved on December 20, 2023, that had its principal place of business in New York, NY.  From 2019 until 2022, its office was in Manhattan, and its principals directed boiler rooms in at least Manhattan and Boca Raton, Florida.  L&G was the entity through which Defendants received commission payments from StraightPath and paid their unregistered sales force.

25.     **Legend** is a Delaware LLC formed on September 1, 2021, with its principal place of business in New York, NY.  From February through October 2022, Legend acted as investment adviser to the Legend Funds.  It has never been registered with the Commission.  Since July 7, 2023, it has been in receivership as a result of the Legend Action.

**FACTS**

I.   **DEFENDANTS DEFRAUDED INVESTORS IN SELLING INTERESTS IN THE STRAIGHTPATH FUNDS**

A.   Background:  StraightPath

26.   StraightPath was founded in 2017.  Its business model was to acquire Pre-IPO Shares or interests in Pre-IPO Shares and to sell to investors interests in LLCs (*i.e.*, the StraightPath Funds) that purportedly owned the Pre-IPO Shares or interests therein.

27.   Pre-IPO Shares are often held by early-stage investors and private company employees and their family members and are not typically widely available to the investing public, including because they are not listed on a national securities exchange.  They are typically attractive to investors due to the potential for high returns in the event the company does make a public offering and there is high demand for its shares, allowing the shares to be sold at substantial profits.

28.   Investment advisers such as StraightPath Management and Legend and their associated sales forces purport to make these sought-after investments accessible to individual members of the investing public at supposedly favorable prices.

29.   The StraightPath offering documents described how different "Series" within each StraightPath Fund were designed to invest in shares of a single Pre-IPO Company.  For example, a Series of "StraightPath Fund 1" purportedly owned Pre-IPO Shares of a particular Pre-IPO Company ("Company A").  Thus, at least according to the offering documents, an investor in a Company A Series of StraightPath Fund 1 would own a proportionate interest in the Pre-IPO Shares of Company A owned by that Series of that Fund.

30.   From approximately November 2017 to February 2022, StraightPath raised at least $410 million by selling interests in nine StraightPath Funds to more than 2,200 investors in nearly every U.S. state and internationally.  StraightPath acquired the Pre-IPO Shares (or interests therein)

and sold them to investors, while StraightPath Management was the investment adviser to each of the StraightPath Funds.

31.     StraightPath, StraightPath Management, their principals, and their associated sales force defrauded investors in the StraightPath Funds in multiple respects, including, as Defendants themselves also did, by misrepresenting that StraightPath did not charge upfront fees when in fact StraightPath marked up the price of Pre-IPO Shares in order to pay large upfront commissions to its principals and their sales force.  Among other things:

    a.  the StraightPath Funds' offering documents, created by StraightPath and StraightPath Management through their principals, stated that StraightPath "may" charge a markup on Pre-IPO Shares, when in reality it charged a substantial markup on every sale;

    b.  StraightPath's welcome letters indicated that StraightPath investors would not be charged upfront fees on their investments, when, again, investors were in fact charged a substantial portion of every contribution they made to pay undisclosed commissions to StraightPath, its principals, and its sales force; and

    c.  StraightPath sales agents told investors on sales calls that they only made money in the event of a profitable Pre-IPO Company listing and there were no upfront fees.

    B.     <u>L&G</u>

32.     Gogliormella and Lacaj formed L&G in May 2019 to sell interests in the StraightPath Funds.  Although Karim Ibrahim was not listed on L&G's corporate-formation documents, he acted as a principal of the firm, including by sharing substantially in the firm's profits and by exercising control over the firm by, among other things, overseeing its sales force.

33.     Before setting up L&G, Defendants had overlapped as registered representatives at multiple broker-dealers.  Given their experience in the securities industry, they were familiar with the registration requirements to engage in brokerage activity.

34.     During the StraightPath Period, L&G received 152 payments from StraightPath totaling nearly $35 million, which Defendants transferred principally to accounts associated with either Gogliormella (more than $8.26 million), Lacaj (more than $5.23 million), or Karim Ibrahim (more than $5.16 million), or to pay transaction-based compensation to more than 50 unregistered sales agents (approximately $14.4 million).

35.     The payments from StraightPath to L&G represented "upfront" commissions, or monies paid at or around the time investors made investments in the StraightPath Funds, and prior to any public listing by the Pre-IPO Companies in whose Pre-IPO Shares investors understood themselves to be investing.  The purpose of these payments was to compensate Defendants and their unregistered sales force for soliciting the investments.

36.     For instance, on November 20, 2020, Gogliormella emailed a principal of StraightPath a spreadsheet entitled "LG BREAKDOWN TO SPVP NOV 20" that showed investor names, their investments, and the "total commission" due from StraightPath to L&G on those investments.  As of the date of the email, neither of the two Pre-IPO Companies listed on the spreadsheet had undertaken a public offering.  Yet, later that same day, StraightPath wired L&G the total commission amount of $289,613 reflected in the spreadsheet.

37.     The amounts paid by L&G to its unregistered sales agents varied depending on the sizes of the investments in the StraightPath Funds that the respective sales agents solicited.

38.     With respect to L&G's operations, Gogliormella served as the primary point of contact between L&G and StraightPath, coordinating which Pre-IPO Companies' shares L&G

would sell and at what price, as well as coordinating with StraightPath and its principals about any issues involving StraightPath investors solicited by L&G.

39.     Lacaj and Karim Ibrahim had primary responsibility for developing sales pitches and training and supervising sales agents, including, at least as to Lacaj, directing sales agents on what to say to prospective investors in particular scenarios.

40.     Defendants themselves also called investors to solicit investments in the StraightPath Funds.

41.     Karim Ibrahim also compiled and distributed marketing emails concerning the relevant Pre-IPO Companies and interfaced with trust companies through which L&G solicited investors to invest money held in retirement accounts.

C.     L&G's Boiler Rooms

42.     Defendants sold interests in the StraightPath Funds by directing their sales force, which during the StraightPath Period worked out of at least two boiler rooms in lower Manhattan and a third boiler room in Boca Raton, Florida.  Defendants each had offices in at least one of the boiler rooms in lower Manhattan and were physically present there on a regular basis.

43.     The boiler rooms typically featured 20 or more sales agents, many in their early 20's, who were directed by Defendants to use sales scripts and lead lists to cold-call hundreds of potential investors each day to earn commissions.  Sales agents pinned the scripts to the walls of their cubicles.

44.     Below is an image of sales scripts pinned to the wall in an L&G boiler room:



45.     Defendants, directly or through intermediaries, distributed scripts to the sales agents. These included (i) Pre-IPO Company-specific pitches and (ii) "rebuttal" scripts (referred to as the "Bible") that consisted of stock responses to anticipated questions or concerns raised by prospective investors.

46.     Lacaj and Karim Ibrahim authored some of the Company-specific and rebuttal scripts.  They also emailed scripts among themselves, including to and from an L&G email address used by all three Defendants, and to members of their sales force.

47.     At least sometimes at Gogliormella's behest, sales agents in the Manhattan boiler rooms would attend morning training sessions—at times referred to as "boot camps"—on delivering the scripts as written and using high-pressure sales tactics to successfully solicit investments.  In at least some of these sessions, scripts would be distributed to agents, and agents would be made to conduct mock rehearsals of making investor pitches and rebutting anticipated investor concerns using these scripts.  Lacaj would typically take the lead at these trainings, and Gogliormella and Karim Ibrahim would also sometimes attend.

14

48.     In addition to the substantial monetary incentives of earning transaction-based compensation upon closing sales to investors, Defendants also used a variety of hazing and bullying tactics against the unregistered sales agents in their boiler rooms.  For example, to motivate sales agents to increase productivity, Gogliormella used abusive or humiliating tactics that included obscene or vulgar acts.  On certain occasions, Gogliormella made sales agents wear tampons on their ears—ostensibly as a badge of dishonor—until the agents in question succeeded in opening new accounts.

49.     During the sales calls, L&G's sales agents would typically tell investors that the relevant Pre-IPO Company was likely to go public "by the 3rd quarter of this year," "in the 4th quarter of this year," "before year's end," or on a similar near-term timeline and that a supposed existing valuation of that Pre-IPO Company was, on a per share basis, several multiples of the price at which StraightPath was offering the Pre-IPO Share interests to investors.  Defendants directed their sales agents to tell investors that investments would imminently double or triple in value without a reasonable basis to do so.

50.     The Company-specific sales pitches were also presented as an opportunity to invest via the StraightPath Funds directly in the Pre-IPO Shares of the particular Pre-IPO Company, not, as was the case at times, through a separate third-party fund that purported to hold the Pre-IPO Shares or interests in Pre-IPO Shares.

51.     As an illustrative example of a Company-specific sales pitch, in or around February 2020, Karim Ibrahim drafted a pitch concerning a Pre-IPO Company, which, even as of today, has not gone public.  Among other misrepresentations, the pitch referenced nonexistent NDAs between L&G and the Pre-IPO Company, which had purportedly allowed L&G advance access to previously confidential information that, the script claimed, had provided a basis for the caller's recommendation of that Pre-IPO Company.  The script then stated—without any identifiable

basis—that, at the price of $38 per share, "you really can't help but to make $ especially w[ith] them set to go public in the 120's by years[*sic*] end."  It exhorted the investor to liquidate other holdings to invest in the Pre-IPO Company, because "on IPO day, your 10K shares would be worth 1.2 [million] at a minimum, without accounting for the appreciation the stock…will show when it does go public."

52.     At Defendants' direction, sales agents would also tell prospective investors that the agents would only make money if the investors made money on a profitable public listing by one of the Pre-IPO Companies.  For instance, Defendants directed sales agents to use the set of rebuttal scripts they called the "Bible," which included a scripted response under the header, "How do you make your money" instructing the agents to tell investors that "[t]here are no upfront costs or commissions to get involved in this investment.  The only fee associated with this purchase is 20% of just your profits. […] If the stock trades flat, we don't get paid and this would be a waste of [my] and your time."  These representations were false because, as Defendants knew, a portion of every investment was being used to compensate Defendants and their sales force regardless of whether the Pre-IPO Company went public.

53.     Similarly, in January 2021, Lacaj emailed to Karim Ibrahim a sales script with the file name "THE BIBLE NEW."  Among other misrepresentations, under the header "I Have Too Many Brokers That Im [sic] Working With," the script instructed sales agents to tell investors that their interests were better served by StraightPath than any stockbrokers the investors were already working with because "[a]s opposed to your stockbroker who charges you a 5% upfront fee, we don't charge you a single dollar of commissions until we turn you a profit.  So, if the stock goes up, down, or sideways, it won't make a difference to them because they already padded their pockets with your hard-earned money.  We ONLY charge you fees based off of your profits, and if you don't turn a profit, we don't charge you a single penny. […] It shows you we're confident and that

both of our interests are aligned.  Trust me[,] we didn't get to a $1.2b[illion] fund by not showing our clients profits!!!"  In addition to the misrepresentation about not charging investors a penny until the investor saw profits, StraightPath was also not a "$1.2b[illion] fund."  Rather, the size of the assets under management in the StraightPath Funds in aggregate was approximately one-third of the claimed figure.  Karim Ibrahim then forwarded this script, as part of a "New Rep Starter Pack" to members of Defendants' unregistered sales force.

54.     Based on the L&G sales calls, investors generally understood that they were paying approximately the same price for Pre-IPO Shares that StraightPath paid to acquire them.  This understanding was important to investors' decisions to invest in the StraightPath Funds.  If investors had known that StraightPath was acquiring the Pre-IPO Shares at substantially lower prices, at least some StraightPath investors likely would not have invested with StraightPath at all.

55.     Similarly, the representation by L&G's sales force that StraightPath only made money at the time of a profitable public listing by a Pre-IPO Company was important to investors.

56.     The sales scripts Defendants distributed to their sales force and which the sales force used to solicit prospective investors contained other misleading statements, including statements falsely suggesting that Defendants (or StraightPath) employed fundamental analysis of the Pre-IPO Companies (they did not), that they had connections to particular high-profile investment professionals who had given them investment recommendations (they did not), and that they had sold Pre-IPO Shares of specific Pre-IPO Companies prior to successful IPOs in the past (when they had not sold Pre-IPO Shares of certain of those Pre-IPO Companies).

57.     In addition to directing the boiler-room sales force, Defendants also communicated directly with StraightPath investors.  Lacaj and Karim Ibrahim personally made material misrepresentations directly to investors, including the misrepresentations about the purported lack of upfront fees discussed above.

58.     For instance, Lacaj successfully solicited one investor to invest in the StraightPath Funds 10 times over the course of 2020 and 2021, with a total investment of almost $300,000, by, among other things, suggesting to him that multiple Pre-IPO Companies were likely to list publicly within a year—none of which has listed publicly even today—and would earn him multiples of his investment.  Lacaj also falsely told this investor that StraightPath built in a small one-or-two-dollar upfront fee to keep its operations running but otherwise derived all of its profits from the 20% back-end commission earned in the event of a profitable public listing.

59.     Karim Ibrahim similarly made material misrepresentations concerning upfront fees directly to StraightPath investors.  In calls with investors, he—using the alias "Chris Hayes"—misrepresented that StraightPath did not earn upfront fees.  Karim Ibrahim also used an email address associated with his alias "Chris Hayes" to make similar misleading statements to investors.

D.      StraightPath Offering Documents

60.     After the sales calls, prospective investors in the StraightPath Funds were sent offering documents, including private placement memoranda ("PPMs") and subscription agreements.  Defendants or their sales force often served as the intermediaries in distributing the StraightPath offering documents to prospective investors.  In at least some instances, Defendants themselves prepared the subscription agreements for the prospective investors.

61.     The PPMs stated that StraightPath "may" charge a markup.  At the same time, the subscription agreements stated that the amount of an investor's contribution equaled the number of Pre-IPO Shares the investor understood himself to be acquiring multiplied by the share price at which the investor understood himself to be acquiring them.  Neither the offering documents nor any related paperwork disclosed that a significant portion of every investment would be paid to StraightPath and, in the case of L&G-solicited investors, personally to Defendants and their unregistered sales force.

62.     After an investment was made, StraightPath, or sometimes Defendants in the case of L&G-solicited investments, would send the investor a confirmation "Welcome Letter" provided by StraightPath stating that an investor's contribution constituted a certain percentage interest in the Series of the StraightPath Fund in which that investor had invested; that that Series owned a certain number of Pre-IPO Shares of a Pre-IPO Company; and that, "[a]fter deduction of fees" (which the Welcome Letters separately indicated were zero), the investor's entire contribution "has been applied to an investment in approximately [the relevant number of] underlying shares of common stock of [a Pre-IPO Company] at a purchase price equivalent to" the price at which the investor understood himself to be acquiring the Pre-IPO Shares.  These statements were false or misleading because StraightPath had acquired the Pre-IPO Share interests at considerably lower prices than those at which the investors were making their investments.

63.     The Welcome Letters distributed by StraightPath or, at times, by Defendants, also stated that certain fees described in the PPMs (management fee, expense fee, due diligence fee) had not been applied to the investor's contribution.  The Welcome Letters did not disclose the substantial markups or upfront commissions.

64.     While overseeing boiler-room sales agents misrepresenting the manner of their compensation, personally in some cases making such misrepresentations, and transmitting StraightPath documents that did the same, Defendants knew or recklessly disregarded that StraightPath was charging a markup and using that markup to pay upfront sales commissions to its sales network, including to Defendants themselves.

65.     Among other things, Defendants knew that they were receiving upfront commission payments from StraightPath because they requested such payments from StraightPath, received millions of dollars from StraightPath in the L&G bank account unconnected to any public listing by a Pre-IPO Company, and withdrew millions of dollars from L&G.

66.     Defendants characterized the payments they were making to their sales force as "commissions" in their own contemporaneous records, while simultaneously directing their sales agents, as reflected in the sales scripts they distributed, to tell investors that there were no commissions charged and that they, like the investors, only made money at the time of a profitable public listing.

67.     All three Defendants themselves also invested in the StraightPath Funds at prices below those at which they were offering the same Pre-IPO shares to members of the investing public.

## II.     DEFENDANTS DEFRAUDED THE LEGEND FUNDS AND THEIR INVESTORS

### A.     Background:  Legend

68.     Defendants set up Legend in September 2021, but it was not until February 2022—at approximately the same time that StraightPath stopped soliciting new money from investors as a result of the Commission staff's investigation—that, in consultation with the principals of StraightPath, Defendants transitioned their boiler-room sales force from selling interests in the StraightPath Funds to selling interests in the Legend Funds.

69.     Ultimately, in addition to setting up Legend, Defendants set up six Legend Fund LLCs, selling interests in five of them.  Gogliormella's and Lacaj's names appeared on the corporate-formation documents for Legend and its affiliated entities, along with Adam Ibrahim's name, but it was Karim Ibrahim, who operated in practice as the third Legend founder and partner and was compensated as such.

70.     At times, sales agents calling on behalf of Legend described Legend to prospective investors as the new name for, or a new division of, StraightPath.

71.     However, in addition to acting as brokers soliciting and facilitating investments in securities as they did with StraightPath, Defendants also operated as investment advisers to the

Legend Funds by virtue of their ownership of Legend and their corresponding compensation for providing advice to the Legend Funds regarding the advisability of investing in securities.

72.     Legend's business was the same as StraightPath's, purporting to offer investors the opportunity to invest in Pre-IPO Companies through the Legend Funds.  Defendants used offering documents that were nearly identical to those used by StraightPath.  Indeed, the initial drafts of certain of Legend's disclosures were authored by one of the principals of StraightPath.

73.     Like StraightPath, Legend characterized the interests it was selling as interests in Series of a Legend Fund that would acquire Pre-IPO Shares, or interests in Pre-IPO Shares, of particular Pre-IPO Companies.

74.     From approximately February through October 2022, Legend raised more than $35 million from at least 319 investors in the Legend Funds located in 48 states and internationally.

75.     With respect to Legend's operations, Defendants had roles similar to those they performed for L&G.

76.     Gogliormella had primary responsibility for sourcing and acquiring interests in Pre-IPO Shares for the sales operation to sell, and for determining the price at which to sell the corresponding Legend Fund interests to investors.

77.     Lacaj and Karim Ibrahim had primary responsibility for developing sales pitches and training and supervising the sales force.

78.     Lacaj and Karim Ibrahim also personally called prospective investors to solicit investments in the Legend Funds.  Additionally, Karim Ibrahim compiled and distributed marketing emails concerning the Pre-IPO Companies that had issued the Pre-IPO Shares in which Legend was selling an economic interest.

79.     Sometime after the Commission issued a subpoena for production of documents related to Defendants' conduct as described herein, Gogliormella told at least certain members of

Legend's sales force that they should delete or destroy evidence of their activities on behalf of Legend.

      B.    <u>Legend Boiler Rooms</u>

80.    During the Legend Period, Defendants continued to operate at least two of the boiler rooms located in lower Manhattan that they had been operating for StraightPath, which were staffed by many of the same callers as in the StraightPath Period.

81.    More than 45 unregistered sales agents conducted cold calls for Legend using lead lists and the same sales scripts in a nearly identical manner as they had done for StraightPath. The sales scripts used by the Legend sales agents included those authored by Lacaj and Karim Ibrahim. Lacaj also continued to conduct trainings on the use of sales scripts during the Legend Period.

82.    As with StraightPath, at Defendants' direction, Legend's sales force told investors that Legend only made money if the investors made money upon completion of a profitable public offering.

83.    The sales scripts Defendants provided to the sales force in their Legend boiler rooms were the very same scripts, including both Pre-IPO Company-specific pitches and "rebuttal" scripts, that they provided to their sales force during the StraightPath Period and contained the same misstatements that there were no upfront fees associated with investing in the Legend Funds.

84.    These point-of-sale misrepresentations were consistent with statements on Legend's website, which was controlled by Defendants, including through their roles as principals of Legend. The website stated that: "The Funds we work with DO NOT charge any upfront fees with this transaction, the only costs involved are charged on the back end of the membership holdings after there is some sort of liquidity event [a]t which time, there will be a 20% fee charged on any profitable portion of your membership holdings, after your initial principle [sic] is recouped." The Legend website stated in no uncertain terms: "No other fees will be assessed."

85.     Similarly, in response to a "Frequently Asked Question" of "How do you price the shares?" Legend's website stated that Legend "uses the last round of financing and expected IPO range as a pricing guidepost," along with other supply and demand factors, without mentioning that Legend marked up shares to, among other things, make substantial upfront commission payments to its principals and unregistered sales force.

86.     Nowhere did Legend's website, which was publicly available until June 2023 shortly before the Commission brought the Legend Action, mention markups or the size or magnitude of the markups Legend was charging.

87.     Legend's website's domain registrar account was held in Lacaj's name.  At least Lacaj and Karim Ibrahim participated in the process of setting up the website, and the website link and/or its content was circulated to each of the Defendants before Legend commenced business.

88.     As in the StraightPath Period, the above-described statements concerning the manner in which Legend was compensated were false because, over the course of the Legend Period, Defendants withdrew over $12 million in investor funds spanning 96 separate withdrawals, pocketing more than $9.3 million for themselves and transmitting more than $3.25 million to Legend's unregistered sales force, all without a single Pre-IPO Company they sold going public. Legend's own accounting documentation identified these payments as "commissions."

89.     As in the StraightPath Period, these commission payments were generated by the markups Legend applied to its sales of Pre-IPO Share interests.  On average, Legend charged investors between 46% and 105% more per Pre-IPO Company than it paid to acquire interests in the underlying Pre-IPO Shares.

90.     As described above with respect to StraightPath investors solicited by L&G, Legend investors also generally understood that they were paying approximately the same price for Pre-IPO Share interests that Legend paid to acquire interests in the Pre-IPO Shares.  This understanding was

important to those investors' decisions to invest with Legend.  If investors had known that Legend was in fact acquiring the Pre-IPO Share interests at substantially lower prices, at least some Legend investors likely would not have invested with Legend at all.

91.     Similarly, the representation by Legend's sales force that Legend, like the investors themselves, only made money at the time of a profitable public listing by a Pre-IPO Company was important to investors.

92.     Legend's sales agents made other misrepresentations at Defendants' direction, including that particular Pre-IPO Companies were likely to go public in the near term resulting in the doubling or tripling of the value of the associated Pre-IPO Shares and that Legend already owned the Pre-IPO Share interests it was selling when it often did not, at least at the time of the sale.

93.     For instance, on October 3, 2022, almost five months after the Commission filed the StraightPath Action, Karim Ibrahim scanned and emailed himself a copy of a Pre-IPO Company pitch that closely resembled pitches used by L&G's sales operation for StraightPath.  The company-specific pitch stated that Legend had a "very limited amount of shares [of the Pre-IPO Company] at a $12B[illion] valuation or $25 a share."  The script directed the caller to pitch the prospective investor on "put[ting] your name on 4000 units at $25 per share," or a "cash outlay of $100 thousand dollars," misleadingly suggesting that an investor's entire solicited contribution of $100,000 would be applied to share acquisition and not to commissions.  In addition, just several weeks before, the source of Legend's interests in that Pre-IPO Company's shares had informed Gogliormella that it was offering Legend the shares "at approximately the Series E valuation of $8B[illion]" (*i.e.*, materially lower than the $12 billion valuation referenced in the script).

94.     The script discussed in the preceding paragraph also stated that the Pre-IPO Company was "planning to go public [in] Q1 2023 with a valuation as high as $50 billion," which

"would put the stock at about $100 per share"; *i.e.*, four times higher than the price at which the applicable Pre-IPO share interests were being marketed to investors, but without any identifiable basis for this representation.  To date, this Pre-IPO Company has still not gone public.

95.    In addition to directing the boiler-room sales force, at least Lacaj and Karim Ibrahim made misrepresentations concerning the purported lack of upfront fees directly to investors.  For example, Lacaj signed a "fee structure" letter sent to a Legend investor that stated that "there are no upfront fees" and "there is a 20% backend fee on profits only."  Similarly, using his alias "Chris Hayes," Karim Ibrahim told a Legend investor that Legend only makes money through a 20% share of an investor's profits and did not charge any other fees.

C.    Legend Offering Documents

96.    Following the sales calls as described above, prospective Legend investors would receive an email from Legend with hyperlinks to offering documents including a PPM and subscription agreement.  The email showed the per-share price at which the Pre-IPO Share interests were being offered, and attached the signature page of the subscription agreement, which showed the amount the investor had agreed to invest as being equal to the number of shares multiplied by the per-share price.

97.    As with StraightPath, the Legend PPMs indicated that Legend "may" charge certain fees, but Defendants communicated to investors through sales calls conducted by their sales force at their direction, through Legend's website, and through Welcome Letters that it was not charging any of those fees or any upfront fees at all.

98.    Until the Legend PPMs were revised in June 2023, as alleged below, like StraightPath, the Legend PPMs also stated that Legend "may" charge a markup.  This statement was false and misleading because, in practice, Legend always charged substantial markups of up to an average of 105% on every sale.

99.     The Legend PPMs also identified only Lacaj as the founder and managing member of Legend, while concealing the roles as founders and managing members of Gogliormella and Karim Ibrahim.  Karim Ibrahim further obscured his role at Legend by first using his "Chris Hayes" alias, and then using his brother Adam Ibrahim's name, as well as email addresses associated with those names to conduct business for Legend, including for corresponding with investors. Defendants were aware that Legend's offering materials failed to disclose the involvement of Gogliormella and Karim Ibrahim.  Lacaj was the only one of the Legend principals who did not have customer complaints or regulatory action (in Karim Ibrahim's case, a FINRA suspension for fraudulent conduct) in his publicly available broker record.

100.     Legend's Welcome Letters, which were signed by Lacaj and distributed, at least in some instances, by Karim Ibrahim, stated that, "[a]fter deduction of fees from your capital contribution," the entire amount invested "has been applied to an investment in approximately" the number of Pre-IPO Shares the investor understood himself to be investing in "at a purchase price equivalent" to the per-share price paid.  The Welcome Letters thus misleadingly conveyed that the entire amount invested by the investor was going to buy shares, and not that investor funds were used to compensate Defendants or their sales force.

101.     Beginning on or about June 30, 2022, Legend created and, at least in some cases, distributed revised PPMs.  By this time, Legend had already raised $26 million, or nearly three-quarters of the total it would ultimately raise, from investors.  These revised PPMs stated that "we are charging a markup," which "will be used to pay expenses of the Fund and to provide compensation to the individuals who oversee the management of the Fund."  But Defendants did not change Legend's website or alter the sales pitches they knew were being used by their sales force in their boiler rooms, which conveyed to investors that they were not paying any upfront fees and

would not be paying any fees or commissions until a Pre-IPO Company held a profitable public listing.

102.     While overseeing boiler-room callers misrepresenting the manner of their compensation, sometimes personally making such misrepresentations, and transmitting Legend documents that did the same, Defendants knew or recklessly disregarded that Legend was charging markups and using those markups to pay upfront sales commissions to its sales force.  Defendants knew that they were receiving upfront commissions because they were withdrawing millions of dollars from the Legend bank account for personal use without any of the Pre-IPO Companies Legend sold going public.

103.     Defendants also took steps to conceal Legend's markups of the prices at which Pre-IPO Shares were offered to investors.  For example, in April 2022, in connection with Legend's acquisition of certain Pre-IPO Share interests, Gogliormella texted the individual sourcing the interests for Legend to send him an email with the details of the number of share interests he was purchasing, the price, and the wiring instructions.  When the individual replied that he would "[s]end [the email] to the Operations email," Gogliormella replied, "No!!!!!!!!  DO NOT SEND ANYTHING TO OPERATIONS EMAIL," adding, "Other people have access to the operations email.  I do not want anything going to that email regarding pricing.  Only send to me" and "I just can't have anything [a]bout purchases and prices etc[.] in anyone's hands but my own."

104.     Similarly, using an email in his brother Adam Ibrahim's name, Karim Ibrahim sent certain investors redacted purchase agreements that purportedly corroborated Legend's actual ownership of interests in the Pre-IPO Shares it was selling to investors, but redacted the prices at which Legend had acquired them (as well as the name of the third-party fund through which Legend had acquired interests in the Pre-IPO Shares).

105.     The markups that Legend, at Defendants' direction, applied to the prices investors paid for interests in Pre-IPO Shares they sought to acquire through investing in the Legend Funds also constituted principal transactions that, pursuant to Advisers Act Section 206(3), required notice and written consent from the affected clients.

106.     Legend, which Defendants owned, sold the Pre-IPO Shares it acquired to an advisory client (*i.e.*, one or more of the Legend Funds) as principal (*i.e.*, for Legend's own account), and the vast majority of these markups flowed through Legend to its owners, the Defendants, each of whom also served as investment advisers to the Legend Funds.

107.     But Defendants never made or caused Legend to make the required disclosure of these principal transactions or received the required written consent from the Legend Fund investors.

## III.   DEFENDANTS VIOLATED THE SECURITIES OFFERING REGISTRATION PROVISIONS

108.     Securities Act Section 5 [15 U.S.C. § 77e] makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale.

109.     None of the Series interests sold by StraightPath or Legend were sold pursuant to a registration statement filed with the Commission.

110.     Defendants engaged in steps necessary to the distribution of interests in the StraightPath and Legend Funds, including by soliciting investors and directing others to do so too.

111.     StraightPath and Legend purported to offer the Series interests on the basis of Rule 506(c) of Regulation D [17 C.F.R. § 230.506(c)], a Commission regulation that provides a safe-harbor registration exemption under Securities Act Section 4(a)(2) for qualifying private offerings.

112.     In order to qualify for the Rule 506(c) safe-harbor, all purchasers of the securities sold must be "accredited investors"—that is, for example, individual investors who had a net worth

(with their spouse) of more than $1 million or annual income exceeding $200,000 or joint income exceeding $300,000.  17 C.F.R. §§ 230.501(a)(5), (a)(6).  In addition, the issuer of the securities must take reasonable steps to verify that the purchasers of the securities are accredited investors, which may include reviewing documentation such as tax records and brokerage or bank account statements.  17 C.F.R. § 230.506(c)(2)(ii).

113.    Neither the StraightPath or Legend Funds, nor StraightPath, L&G, Legend, or Defendants on their behalf, took reasonable steps with respect to the overwhelming majority of the Series interests sold to investors.

114.    The investments in the StraightPath and Legend Funds were solicited by unregistered sales agents.

115.    For these investors, StraightPath and Legend did little more than collect signed purchaser questionnaires—that is, self-certifications—concerning whether the investor qualified as an accredited investor.

116.    StraightPath and Legend almost never verified these claims by collecting any of the types of documents identified in Rule 506(c)(2)(ii).

## IV.    DEFENDANTS VIOLATED THE BROKER-DEALER REGISTRATION PROVISIONS

117.    Exchange Act Section 15(a)(1) makes it unlawful for any broker or dealer "to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security" unless such broker or dealer is registered with the Commission.  15 U.S.C. § 78o(a)(1).

118.    Defendants violated these provisions by hiring, training, and running a vast sales network to sell the Series interests, to which they paid commissions typically generated by the undisclosed markups on the StraightPath or Legend Fund interests.

119.    This sales network included more than 50 sales agents.  Many of the sales agents worked in the boiler rooms for Defendants' operations during both the StraightPath Period and the Legend Period.

120.    Many of these sales agents made cold calls to potential investors using lead lists and sales scripts provided by Defendants.

121.    The sales agents Defendants used were not licensed or associated with registered brokerage firms.  In fact, certain of these sales agents previously had been permanently barred from working as securities brokers by FINRA.

122.    Defendants knew that the sales agents they recruited to sell securities for L&G and Legend were not associated with a registered broker at the time of those sales because L&G and Legend were not registered brokers.

123.    Nevertheless, Defendants paid these unregistered sales agents upfront commissions—that is, a percentage of the amounts of money they raised for the StraightPath and Legend Funds.

124.    Overall, during the StraightPath Period, Defendants paid more than $14.4 million in commissions to these unregistered sales agents.  During the Legend Period, Legend, at Defendants' direction, paid an additional more than $3.25 million in commissions to these unregistered sales agents.

## V.    ADAM IBRAHIM RECEIVED ILL-GOTTEN GAINS

125.    Adam Ibrahim received cash, interests in the StraightPath Funds, and Pre-IPO Shares that either were, or were acquired with, proceeds of Karim Ibrahim's above-described misconduct.  Specifically, Adam Ibrahim received: (i) more than $480,000 in cash via at least 50 transfers from accounts associated with Karim Ibrahim between 2019 and 2022, which were funded with investor proceeds; (ii) almost $550,000 in interests in the StraightPath Funds purchased in his

name with funds from an account associated with Karim Ibrahim that received Karim Ibrahim's proceeds of his StraightPath misconduct; and (iii) more than $800,000 in Pre-IPO Shares in his brokerage account that represented compensation for Karim Ibrahim's work for StraightPath.

126.     Adam Ibrahim did not have a legitimate claim to these assets.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Lacaj and Karim Ibrahim)

127.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10 and 18 through 104.

128.     Lacaj and Karim Ibrahim, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes, or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

129.     By reason of the foregoing, Lacaj and Karim Ibrahim, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(1) and 17(a)(3)
### (Gogliormella)

130.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10 and 18 through 104.

131.     Gogliormella, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly has employed one or more devices, schemes, or artifices to defraud, and/or (ii) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

132.     By reason of the foregoing, Gogliormella, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

### THIRD CLAIM FOR RELIEF
#### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
#### (Lacaj and Karim Ibrahim)

133.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10 and 18 through 104.

134.     Lacaj and Karim Ibrahim, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

135.     By reason of the foregoing, Lacaj and Karim Ibrahim directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10(b)-5].

## FOURTH CLAIM FOR RELIEF
## Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder
## (Gogliormella)

136.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10 and 18 through 104.

137.    Gogliormella, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

138.    By reason of the foregoing, Gogliormella directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## FIFTH CLAIM FOR RELIEF
## Control Person Liability for Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
## (Gogliormella)

139.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10 and 18 through 104.

140.    As alleged above, L&G and Legend violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

141.    From June 2019 through February 2022, with the other Defendants, Gogliormella controlled L&G, and, from February through October 2022, with the other Defendants, he controlled Legend.  At all relevant times, Gogliormella was a culpable participant in the violations by L&G and Legend of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

33

142.    By reason of the foregoing, Gogliormella is liable as a control person pursuant to Exchange Act Section 20(a) for the violations by L&G and Legend of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### SIXTH CLAIM FOR RELIEF
### Advisers Act Sections 206(1) and (2)
### (All Defendants)

143.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10, 18 through 25, and 68 through 104.

144.    From at least February through October 2022, Defendants were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)] and had an adviser-client relationship with and therefore owed a fiduciary duty to the Legend Funds.

145.    From at least February through October 2022, while acting as investment advisers, Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, have: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon any client or prospective client.

146.    By reason of the foregoing, Defendants directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### SEVENTH CLAIM FOR RELIEF
### Advisers Act Section 206(3)
### (All Defendants)

147.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10, 18 through 25, and 68 through 107.

148.     From at least February through October 2022, Defendants were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)] and had an adviser-client relationship with and therefore owed a fiduciary duty to the Legend Funds.

149.     From at least February through October 2022, while acting as investment advisers, Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, have, acting as principal for their own account, knowingly sold securities to any client, without disclosing to such client in writing before the completion of such transaction the capacity in which they were acting and obtaining the consent of the client to such transaction.

150.     By reason of the foregoing, Defendants directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(3) [15 U.S.C. § 80b-6(3)].

## EIGHTH CLAIM FOR RELIEF
### Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder
### (All Defendants)

151.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10, 18 through 25, and 68 through 104.

152.     From at least February through October 2022, Defendants were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)] and had an adviser-client relationship with and therefore owed a fiduciary duty to the Legend Funds, which were pooled investment vehicles as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

153.     From at least February through October 2022, while acting as investment advisers, Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly, recklessly, or negligently (i) made one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or

35

prospective investor in the pooled investment vehicle, and/or (ii) engaged in any act, practice, or course of business which is fraudulent, deceptive, or manipulative, with respect to any investor or prospective investor in the pooled investment vehicle.

154.    By reason of the foregoing, Defendants directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### NINTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and (c)
### (All Defendants)

155.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10, 18 through 48, 57 through 81, 84 through 87, 95 through 101, and 108 through 116.

156.    From at least June 2019 through October 2022, Defendants, directly or indirectly, singly or in concert, and notwithstanding the fact that there was no applicable exemption: (i) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

157.    By reason of the foregoing, Defendants, directly or indirectly, have violated and, unless enjoined, will again violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. § 77e(a) and 77e(c)].

## TENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(a)
### (All Defendants)

158.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 10, 18 through 104, and 117 through 124.

159.     From at least June 2019 through October 2022, Defendants, while not registered

with the Commission as a broker or dealer or associated with a registered broker or dealer, made use

of the mails or other means or instrumentality of interstate commerce to effect transactions in, or to

induce or attempt to induce the purchase or sale of, securities other than exempted securities or

commercial paper, bankers' acceptances, or commercial bills.

160.     By reason of the foregoing, Defendants, directly or indirectly, violated and, unless

enjoined, will again violate Exchange Act Section 15(a)(1) [15 U.S.C. § 78o].

## ELEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (All Defendants)

161.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 10 and 18 through 104.

162.     As alleged above, StraightPath, StraightPath Management, and Legend violated

Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

163.     Defendants knowingly or recklessly provided substantial assistance to StraightPath,

StraightPath Management, and Legend with respect to their violations of Securities Act Section 17(a)

[15 U.S.C. § 77q(a)].

164.     By reason of the foregoing, Defendants are liable for aiding and abetting

StraightPath's, StraightPath Management's, and Legend's violations of Securities Act Section 17(a)

[15 U.S.C. § 77q(a)], and unless enjoined, will again aid and abet these violations.

## TWELFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (All Defendants)

165.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10 and 18 through 104.

166.     As alleged above, StraightPath, StraightPath Management, and Legend violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

167.     Defendants knowingly or recklessly provided substantial assistance to StraightPath, StraightPath Management, and Legend with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

168.     By reason of the foregoing, Defendants are liable for aiding and abetting StraightPath's, StraightPath Management's, and Legend's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless enjoined, will again aid and abet these violations.

## THIRTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Advisers Act Section 206 and Rule 206(4)-8 Thereunder
### (All Defendants)

169.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10, 18 through 25, and 68 through 104.

170.     As alleged above, Legend violated Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

171.     Defendants knowingly or recklessly provided substantial assistance to Legend with respect to its violations of Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

172.     By reason of the foregoing, Defendants are liable for aiding and abetting Legend's violations of Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. § 80b-6] and

Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and unless enjoined, will again aid and abet these violations.

## FOURTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 5(a) and 5(c)
### (All Defendants)

173.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10, 18 through 48, 57 through 81, 84 through 87, and 95 through 101, and 108 through 116.

174.     As alleged above, StraightPath, StraightPath Management, and Legend violated Securities Act Sections 5(a) and 5(c) [15 U.S.C. § 77e].

175.     Defendants knowingly or recklessly provided substantial assistance to StraightPath, StraightPath Management, and Legend with respect to their violations of Securities Act Sections 5(a) and 5(c) [15 U.S.C. § 77e].

176.     By reason of the foregoing, Defendants are liable for aiding and abetting StraightPath's, StraightPath Management's, and Legend's violations of Securities Act Sections 5(a) and 5(c) [15 U.S.C. § 77e], and unless enjoined, Defendants will again aid and abet these violations.

## FIFTEENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 15(a)
### (All Defendants)

177.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 10, 18 through 104, and 117 through 124.

178.     As alleged above, StraightPath, StraightPath Management, and Legend violated Exchange Act Section 15(a) [15 U.S.C. § 78o].

179.     Defendants knowingly or recklessly provided substantial assistance to StraightPath, StraightPath Management, and Legend with respect to their violations of Exchange Act Section 15(a) [15 U.S.C. § 78o].

180.    By reason of the foregoing, Defendants are liable for aiding and abetting StraightPath's, StraightPath Management's, and Legend's violations of Exchange Act Section 15(a) [15 U.S.C. § 78o], and unless enjoined, Defendants will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Defendants, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, or aiding and abetting violations of, directly or indirectly, Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), (3), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### II.

Ordering Defendants to disgorge the ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### III.

Ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)];

### IV.

Ordering Relief Defendant Adam Ibrahim to pay, with prejudgment interest, all ill-gotten

gains by which he was unjustly enriched, under Exchange Act Section 21(d)(6)( [15 U.S.C.

§ 78u(d)(6)]; and

## V.

Granting any other and further relief this Court may deem just and proper.

Dated:  June 7, 2024
        New York, New York


       /s/ Antonia M. Apps
       ANTONIA M. APPS
       REGIONAL DIRECTOR
       Sheldon L. Pollock
       Lee A. Greenwood
       Steven G. Rawlings
       Daniel Loss
       Sushila Rao Pentapati
       Suzanne M. Bettis
       Joshua D. Tannen
       Attorneys for Plaintiff
       SECURITIES AND EXCHANGE COMMISSION
       New York Regional Office
       100 Pearl Street, Suite 20-100
       New York, New York 10004
       212-336-0410 (Rao Pentapati)
       PentapatiSu@sec.gov